Filed 3/20/25  P. v. Hobbs CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM GENE HOBBS,<br><br>        Defendant and Appellant. | A168137<br><br>(City & County of San Francisco Super. Ct. No. CRI-22012177) |

Between November of 2021 and September of 2022, on the streets of San Francisco, Hobbs allegedly committed a series of offenses involving 13 different women.  Hobbs was eventually charged with 13 counts based on the incidents, including one count each of felony false imprisonment and assault, and multiple counts of simple and sexual battery.  Tried by a jury, Hobbs was found guilty of nine of the charges, and sentenced to 30 months in county jail followed by three years in state prison.  He argues that the trial court erred in denying his motion for a new trial as to the felony false imprisonment count made on the grounds that the verdict was not unanimous, and that the evidence was insufficient to establish either that he committed felony false imprisonment or that he committed the touchings supporting the two sexual battery convictions for sexual purposes.  We affirm.

1

# BACKGROUND

**The Charges and Trial**

# BACKGROUND

**The Charges and Trial**

On April 19, 2023, the San Francisco County District Attorney filed the operative first amended information, charging Hobbs with one count of felony false imprisonment (Pen. Code[1], § 236) (count I), three counts of sexual battery (§ 243.4, subd. (e)(1)) (counts II, V, and IX), eight counts of simple battery (§ 242) (counts III, IV, VI, VII, VIII, X, XI, and XIII), and one count of assault (§ 240) (count XII). In addition, with respect to count I—the only felony count—the information alleged multiple circumstances in aggravation with respect to both the crime and the defendant under California Rules of Court, rule 4.421.

Hobbs was tried by jury over some 10 court days between May 2 and May 15, 2023.[2] And as it relates to the particular counts at issue on appeal[3], some of the testimony at trial was as follows:

**Felony False Imprisonment of Madeleine E. (Count I)**

At approximately 2:00 p.m. on November 16, 2021, Madeleine E.[4] was walking her dog along Webster Street near Broadway in San Francisco when she stopped to clean up after it. While she was tying up the bag, "[s]omeone

---

[1] Further undesignated statutory references are to the Penal Code.

[2] On May 2, count IX was severed on the prosecution's motion due to the unavailability of the victim as a witness. On May 11, the trial court dismissed count VIII pursuant to section 1118.1, and count III was amended, after the testimony of the victim, to the lesser-included offense of simple assault (§ 240) to conform to proof.

[3] Because the facts underlying the other charges are not relevant to the issues on appeal, we omit any discussion of them.

[4] Because the victims at trial gave only the first initial of their last names, we will occasionally refer to them by their first names.

2

rushed up from behind me and grabbed me, lifting me up." Madeleine, who is 5 feet 4 inches tall, estimated that Hobbs was "a foot taller than me," and, while she was in his arms, she "couldn't move [her] body." After "what seemed like a few minutes," Madeleine said, " 'Get off of me,' and [she] was set back down on the ground." She then "took a step backwards," "[t]urned to face the person," and said, " 'What the heck?' " Hobbs "didn't say anything," but "looked [her] dead in the eyes and then just creepily smiled." Madeleine testified that she was moved from Webster Street to the curb on Broadway, a distance she estimated in court was the same as that from the court reporter to the end of the jury box, which the trial court later estimated was approximately 15 feet.

After Hobbs released her, Madeleine walked towards the end of the block to a nearby school security guard. When she looked back to see if Hobbs was following her, she saw that he "just kind of stood in that same spot." Madeleine called the police on the day of the incident, but did not file a report at that time. She ultimately reported the incident in September of 2022 after seeing an image of Hobbs on social media.

### Sexual battery of McCall M. (Count 2)

At approximately 10:35 a.m. on November 20, 2021, McCall M., who was newly pregnant, was at the corner of Noe and Ford Streets in San Francisco, preparing to walk toward Starbucks at 18th and Castro Streets to get her morning coffee. As she passed a different coffee shop, she noticed Hobbs—whom she estimated was between 6 feet and 6 feet 5 inches tall—wearing bright yellow or green clothing and "grinning in . . . a very

3

exaggerated way," which "caught [her] attention because it seemed unnatural."

McCall continued walking, but soon "sens[ed] someone was behind [her]." Hobbs was walking some five or six paces behind her for about a block, and then she "fe[lt] someone grab [her] buttocks aggressively," in a way that "wasn't even a pinch, it was like a full grab, like someone wanted me to notice them kind of thing." According to McCall, she had "never had my butt grabbed in that way, even by my husband, so it was unnatural. Even if it was someone that, like, you would typically give permission to do that." McCall demonstrated the grab for the jury on a mannequin in the courtroom, and stated that "the way it felt was it had to have at least been three fingers to create a squeeze motion . . . [because] it was more than just a pinch."

After being groped, McCall locked eyes with Hobbs and said, "What the hell" very loud. Hobbs "briefly looked back but picked up his pace." He then turned back towards McCall and said, " 'I thought you were someone else,' with a grin."

McCall called her husband, who was nearby getting his own coffee. He met her at the corner of Noe and Ford, and she told him what had happened, described Hobbs, and told him the direction in which Hobbs had started walking. She and her husband then separated, and shortly thereafter he texted her a photo of Hobbs, and stated that he had witnessed Hobbs grab another woman. McCall called the police, but decided not to press charges after being told that Hobbs would likely be "let free" whether or not she did so.

### Sexual battery of Kelsey S. (Count 5)

At approximately 11:00 a.m. on April 30, 2022, Kelsey S. was running south along the Embarcadero toward the Bay Bridge with her friend Rachel

4

R.  As she ran, Kelsey saw Hobbs cross the street at a crosswalk, "wearing a salmon pink-colored shirt," with "shorter hair" and "very tall."  Shortly thereafter, she "heard running footsteps behind" her, and then she "felt . . . someone come up behind me and grab pretty aggressively my right butt." Kelsey described the way in which she was grabbed as that she was "[s]lapped and then squeezed rather hard," in a way that "did not feel like an accident," but "felt very purposeful . . . it wasn't like somebody grazed past me."  Kelsey stopped running and confronted Hobbs, asking him, "Why did you do that?"  Hobbs said, " 'Because I felt like it.' "  Kelsey "did [her] best to deescalate the situation" and told Hobbs, " 'Don't touch me.  Don't touch women like that ever again.' "  She then walked a couple of steps away and lost Hobbs in the crowd.  Later, in September of 2022, Kelsey saw a news article with Hobbs' picture after hearing it discussed by her co-workers, at which point she reported the incident to the police.

Rachel R. testified that as she was running with Kelsey S. on April 22, "all of a sudden this very tall man comes out of nowhere from behind us and accosts Kelsey."  Hobbs "ran up behind her and from my perspective it looked like he put his hand between her legs and grabbed her, to which she shoved him off of her."  Rachel did not remember exactly what Hobbs said, but did remember that it was "some kind of lewd comment," "like he was talking about her body or something," and that it was "really off-putting and really creepy."  Rachel demonstrated the groping action on a mannequin at trial, in a way the prosecutor described for the record as putting his "hands between the mannequin's leg and sort of moved [his] hand upward," and then "put [his] hand on the right buttocks of the mannequin."

**The Jury's Deliberations and Verdicts**

Jury deliberations began around 11:00 a.m. on May 15, continued on May 16, and concluded at 2:36 p.m. on May 17, when the jury sent a note indicating that it had reached unanimous verdicts on nine of the 11 remaining charges. The jury was brought into the courtroom, and the verdicts were read aloud—guilty on each count with the exception of counts IV and XII. Both parties waived polling of the jury. With respect to counts IV and XII, the foreperson told the trial court that the vote on count IV had been six to six, and that the jury did not "vote at all" on count XII, because "[w]e polled each other individually" and "based on the discussions it didn't make any difference." After the foreperson indicated that further readback of testimony, instructions, or deliberations would not help the jury reach a unanimous verdict on either count IV or count XII, and the jurors were individually polled and agreed, the trial court declared a mistrial as to those counts and the jury was discharged.

On May 30, a court trial was held on four of the circumstances in aggravation with respect to count I: (1) that the victim was "particularly vulnerable"; (2) that Hobbs had "prior convictions as an adult" which were "numerous or of increasing seriousness"; (3) that Hobbs had "served a prior term in prison or county jail under section 1170, subdivision (h)"; and (4) that his "prior performance on probation, mandatory supervision, postrelease community supervision, or parole was unsatisfactory." (See California Rules of Court, rule 4.421(a)(3) & (b)(2), (3), (5).) The trial court found three of the four true, with the exception of the factor that the victim was particularly vulnerable, as to which the trial court reserved decision. Sentencing was set for June 8.

**Motion For a New Trial**

On June 5, Hobbs filed a motion for a new trial (or alternatively, a mistrial) as to count I pursuant to section 1181, arguing that he was deprived of his Sixth Amendment right to a unanimous verdict because one juror had, in fact, voted not guilty on that count. The motion attached a declaration from Juror No. 3, executed June 1, and which provided in its entirety as follows:

"1. I served as a juror in the recent trial of *People v. Bill Hobbs*.

"2. I was seated as Juror Number 4.[5]

"3. On Tuesday, May 16, 2023, and Wednesday May 17, 2023, the jury discussed Count 1.

"4. Count 1 dealt with allegations against a witness named Madeline E.

"5. In the deliberations room, I voiced the reasons behind my vote of not guilty as to Count 1.

"6. Other jurors, including the foreperson, disagreed with my view of the evidence.

"7. The foreperson never said anything else about that count nor did he ask me any questions about that count.

"8. On Wednesday, May 17, 2023, the verdict was read in court. I heard the verdicts of 'guilty' read by the clerk. While this did not account for my vote of 'not-guilty,' I did not know what to do at the time. Nobody in court asked me if that was really my vote for Count 1.

---

[5] Although the declaration stated that the juror in question was Juror No. 4, according to both parties' briefs, the juror was actually Juror No. 3.

"9. After I went home for the night, I realized my vote had been recorded incorrectly for Count 1.

"10. After reflecting on what was read in court, that I realized a mistake was made. Given what happened, I had trouble sleeping Wednesday night.

"11. As soon as the Public Defender's office opened the next day, I went to try and have Mr. Breecker [defense counsel] fix the situation. Specifically, I wanted him to know that my verdict for Count 1 was, in fact, not guilty.

"12. I first met with an attorney, Peter Calloway, and then briefly with Mr. Breecker. Shortly thereafter, I spoke with Jill Schroeder, an investigator.

"13. It is clear to me now, that the foreperson did not accurately record my vote of not guilty for that count.

"14. My true vote for Count 1 was not guilty."

On June 7, the prosecution filed opposition, arguing that the majority of the statements in Juror No. 3's declaration were inadmissible under Evidence Code section 1150—specifically "paragraph 5, paragraph 6, the second sentence in paragraph 8, paragraph 9, both sentences in paragraph 10, the second sentence in paragraph 11, paragraph 13, and paragraph 14"— because they were evidence of jurors' subjective mental processes and statements made during the course of their deliberations. The prosecution argued that the admissible balance of the declaration did not describe any juror misconduct that would justify a new trial.[6]

---

[6] The opposition also attached the declaration of the prosecutor, stating that after the verdict, she and defense counsel had discussed the case with the jury for at least thirty minutes, and that "[a]t no point during these discussions did Juror 3 state that an incorrect vote was counted as to Count 1." The declaration further stated that that same day, "Count 1 was

8

At sentencing on June 8, after finding true the circumstance in aggravation that Madeleine E. was particularly vulnerable, the trial court heard argument on the motion for a new trial. The trial court then ruled as follows:

"On the new trial motion, I've read the papers of both sides. And I've listened to these arguments this morning, Mr. Hobbs. On the evidence point, which is important for this motion, I do find that Evidence Code Section 1150 does apply to this particular case, Mr. Breecker. And I am persuaded by the detailed analysis offered by Ms. Delgado the prosecutor in response to your motion and because I am persuaded, I will strike as inadmissible those portions of the declaration identified by Ms. Delgado. I reviewed them myself and I agree with her points. And what is left is not information that rises to the level of a proper challenge to the vote of Juror No. 3 for this case. I think what is happening here, it's my view, is that there is a difference between 12 jurors deliberating, making a decision together, coming back into open court, the verdicts being announced when everybody is together and on other hand, once the jury is excused and all of the jurors go back to their individual lives and they think about the decisions that were made when they were all together, the aftermath when somebody is alone reconsidering his decision, reconsidering his vote, changing his mind, one way to describe it

specifically discussed by Juror 3 and at least four other jurors in the presence of both the defense and the prosecution . . . Nothing about an 'incorrect vote' as to Count 1 was raised at any point during that 30-minute or more discussion, by Juror 3 or any other juror," and that "[d]uring the course of the discussion with the jurors, Juror 7 also participated in the conversation to convey the information that the distribution of votes as to Count 12 was split nine votes for guilty and three votes for not guilty. Juror 3 was present for that statement by Juror 7 and the discussion about the two undecided counts."

9

is impeaching his own vote, I think as I view it that is what is happening here. I want to be really clear.

"I think, I'm focusing on the juror not on you, Mr. Breecker. I'm focusing on the juror. And I'm taking the time to lay out the difference between everybody together and after being discharged going back individually to life. Sometimes a person once he is on his own reconsiders what happened when that jury was all together. That can make all of the difference. And on the admissible evidence here, I do not see that something happened in that jury room where his clear vote for not guilty on Count 1 was ignored and somehow rejected by the foreperson and other members of that jury. I don't see that. And, therefore, I think that the verdict to Count 1 was fairly returned unanimously. So the motion for a new trial is denied for all of those reasons."

**Sentencing**

The trial court went on to sentence Hobbs as follows: in county jail, six months on counts II and V, and three months on the other six counts save count I (counts VI, VII, X, XI, and XIII) all consecutive to each other, for a total of 30 months in county jail, and the upper term of three years in state prison on count I, consecutive to and after the county jail term.

Hobbs filed a notice of appeal.

## DISCUSSION

### The Trial Court Did Not Err in Denying the Motion for a New Trial

#### Applicable Law

Section 1181 permits the court to grant a new trial: "3. When the jury has separated without leave of the court after retiring to deliberate upon their verdict, or been guilty of any misconduct by which a fair and due

10

consideration of the case has been prevented; [or] [¶] 4. When the verdict has been decided by lot, or by any means other than a fair expression of opinion on the part of all jurors."

Evidence Code section 1150, subdivision (a) provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." " 'This statute distinguishes "between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved." ' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1281.) Juror's statements " 'must be admitted with caution,' because '[s]tatements have a greater tendency than nonverbal acts to implicate the reasoning processes of jurors.' [Citation.] But statements made by jurors during deliberations are admissible under Evidence Code section 1150 when 'the very making of the statement sought to be admitted would itself constitute misconduct.' " (*People v. Cleveland* (2001) 25 Cal.4th 466, 484.) " '[E]vidence that violates Evidence Code section 1150 is not merely inadmissible; it is irrelevant—"of no jural consequence." ' " (*In re Hansen* (2014) 227 Cal.App.4th 906, 928–929.)

" 'Courts evaluate a motion for a new trial based on jury misconduct in three steps: (1) determine what evidence is admissible; (2) if there is admissible evidence, decide if it establishes misconduct; and (3) if there is

11

misconduct, determine whether it was prejudicial.' (*People v. Flores* (2021) 70 Cal.App.5th 100, 107.)" (*People v. Herrera* (2024) 102 Cal.App.5th 178, 195.)

The first step—determining whether the evidence supporting the motion for a new trial is admissible under Evidence Code section 1150—we review, "like any other issue of admissibility . . . for abuse of discretion." (*People v. Flores*, *supra*, 70 Cal.App.5th at p. 108; *Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 345.) "[T]he initial burden is on defendant to prove the misconduct. [Citation.] We will not presume greater misconduct than the evidence shows." (*In re Carpenter* (1995) 9 Cal.4th 634, 657; see *Donovan v. Poway Unified School District* (2008) 167 Cal.App.4th 567, 625 ["The moving party bears the burden of establishing juror misconduct"]; *Barboni v. Tuomi*, *supra*, 210 Cal.App.4th at p. 345 [same].) The second step—determining whether the admissible evidence establishes misconduct—is " 'a legal question we review independently.' " (*People v. Herrera*, *supra*, 102 Cal.App.5th at p. 195, quoting *People v. Collins* (2010) 49 Cal.4th 175, 242.) But in doing so, we " ' "accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." ' " (*People v. Gamache* (2010) 48 Cal.4th 347, 396.)

**Analysis**

In his opening brief, Hobbs concedes that if the trial court's ruling on the prosecution's evidentiary objections to Juror No. 3's declaration was correct, the balance of that declaration "did not support a grant of a new trial as to Count 1." We thus turn first to that ruling, a ruling, as noted above, we review for abuse of discretion.

Hobbs' brief asserts that the "heart of the matter" were the following portions of Juror No. 3's declaration: "5. In the deliberations room, I voiced the reasons behind my vote of not guilty as to Count 1. [¶] 6. Other jurors,

12

including the foreperson, disagreed with my view of the evidence. [¶] 7. The foreperson never said anything else about that count nor did he ask me any questions about that count." Hobbs argues that paragraph 5 was fully admissible, that paragraph 6's admissibility "depends on how it is interpreted,"[7] and that if Juror No. 3 had "stated a 'vote of not guilty as to Count 1,'" and "'[t]he foreperson never said anything else about that count nor did he ask [Juror No. 3] any questions about that count,' a verdict was returned in open court as to Count 1 *on which all twelve jurors had not agreed.*" We are not persuaded.

The statements that Juror No. 3 "voiced the reasons behind my vote of not guilty" and that "[o]ther jurors . . . disagreed with my view of the evidence" are plainly directed at the jurors' subjective thought processes and reasoning behind their votes. And "when a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror's mental processes. Consideration of such a statement as evidence of those processes is barred by Evidence Code section 1150." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419.) The trial court did not abuse its discretion in finding this evidence inadmissible. And in any event, even if the statements were admissible, the fact that the jury discussed the evidence—and even disagreed about it—does not reflect any improper deliberations or misconduct.

_____

[7] Somewhat ironically, given that his opening brief repeatedly complains of the trial court's "rewriting" and "pruning" of Juror No. 3's declaration, Hobbs' counsel argues that paragraph 6 of that declaration "*might* arguably be said to have concerned other jurors' 'mental processes,' *but not* if that paragraph is interpreted as: 'Other jurors, including the foreperson, [stated that they] disagreed with my view of the evidence.'"

13

Thus, to satisfy Hobbs' initial evidentiary burden of demonstrating misconduct, we are left with Juror No. 3's oblique reference to "my vote of not guilty on Count 1," together with the fact that "[t]he foreperson" did not thereafter "sa[y] anything else about that count" or "ask [Juror No. 3] any questions about" it. But the declaration carefully—perhaps tellingly—does not directly state that Juror No. 3 actually voted not guilty, nor does it explain how the jury's voting was conducted, how many votes took place, when in the three-day process of deliberations the vote or votes where Juror No. 3 purportedly voted not guilty on count I occurred, or how the jury ultimately came to submit a verdict form, signed by the foreperson, indicating a guilty verdict on count I. Nor does it offer any explanation for why Juror No. 3, after hearing the verdict read aloud, failed to mention the purportedly incorrect vote during the trial court's discussion with the jury of the two counts on which they failed to reach a verdict, or while participating in extensive conversations about the case with the prosecutor and defense counsel afterwards. We expect that defense counsel—who, along with another attorney and an investigator from his office, interviewed Juror No. 3 and presumably prepared the declaration—would have included any such details had they supported the motion.

Furthermore, as noted, in considering a claim of juror misconduct, we accept the trial court's credibility determinations and findings of historical fact when supported by substantial evidence. (*People v. Gamache, supra*, 48 Cal.4th at p. 396.) Here, after considering the declarations of both Juror No. 3 and the prosecutor, the trial court concluded that "on the admissible evidence here, I do not see that something happened in that jury room where his clear vote for not guilty on Count 1 was ignored and somehow rejected by the foreperson and other members of that jury." That finding—to the extent

14

it was a finding regarding Juror No. 3's credibility—is supported by substantial evidence, and we must accept it. (See *People v. Flores*, *supra*, 70 Cal.App.5th at p. 109 [declining to consider declaration of juror whom trial court found not credible on appeal from denial of motion for new trial]; *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1463–1465.) Given all this, we conclude that Hobbs failed to carry his initial burden to demonstrate jury misconduct, and that the trial court did not err in denying his motion for a new trial.[8]

### Substantial Evidence Supports Hobbs' Conviction for Felony False Imprisonment of Madeleine E.

Hobbs argues that there was not substantial evidence to support the jury's verdict finding him guilty of felony as opposed to misdemeanor false imprisonment. We disagree.

False imprisonment is defined as the "unlawful violation of the personal liberty of another." (§ 236.) If it is "effected by violence, menace, fraud, or deceit," the crime is a felony. (§ 237, subd. (a).) "In this context, 'violence' means using physical force greater than the force reasonably necessary to restrain someone. (*People v. Reed* (2000) 78 Cal.App.4th 274,

___

[8] Hobbs also argues that Juror No. 3's declaration was sufficient to require the trial court to hold an evidentiary hearing on his claim of jury misconduct. "We review for abuse of discretion the trial court's denial of defendant's postverdict request for an evidentiary hearing into allegations of jury misconduct." (*People v. Carter* (2003) 30 Cal.4th 1166, 1216.) "A court must hold an evidentiary hearing on alleged jury misconduct only when the defendant shows 'a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 55.) As discussed, Hobbs failed to make the required showing here, and Hobbs does not identify any " 'material conflict' " in the parties' evidence " 'that [could] only be resolved at such a hearing.' " (*Ibid*.)

280.)" (*People v. Whitmore* (2022) 80 Cal.App.5th 116, 130.) "The essential element of false imprisonment, be it misdemeanor or felony, is restraint of the person." (*People v. Fernandez* (1994) 26 Cal.App.4th 710, 717.)

The jury in this case was instructed, pursuant to CALCRIM No. 1240, that felony false imprisonment requires: "1.) The defendant intentionally restrained, or confined, or detained Madeleine E. by violence or menace; [¶] AND [¶] 2.) The defendant made Madeleine E. stay or go somewhere against that person's will. [¶] *Violence* means using physical force that is greater than the force reasonably necessary to restrain someone. [¶] *Menace* means a verbal or physical threat of harm. The threat of harm may be express or implied. [¶] An act is done *against a person's will* if that person does not consent to the act. In order to *consent*, a person must act freely and voluntarily and know the nature of the act."

In evaluating Hobbs' claim, " 'we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial

16

evidence. [Citation.]" [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Manibusan*, *supra*, 58 Cal.4th at p. 87; see *People v. Waqa* (2023) 92 Cal.App.5th 565, 576.)

Substantial evidence supports the jury's conclusion that Hobbs was guilty of felony false imprisonment, i.e., that he "us[ed] physical force greater than the force reasonably necessary to restrain" Madeleine when he picked her up and carried her across the street. (*People v. Whitmore*, *supra*, 80 Cal.App.5th at p. 130.)

*People v. Castro* (2006) 138 Cal.App.4th 137 (*Castro*) is directly on point. There, the victim was walking to a bus stop on her way to school when the defendant grabbed her by the arm, turned her around and pulled her "a couple of steps" toward his car. (*Id*. at p. 140–142.) In finding that this was sufficient to establish felony as opposed to misdemeanor false imprisonment, the Court of Appeal explained as follows: "In the present case, appellant grabbed the victim and turned her around. If that is all that had happened, we would agree with appellant that his conduct amounted only to misdemeanor false imprisonment. But appellant pulled her toward his car, an act more than what was required to stop her and keep her where she was located. . . . [T]he evidence that appellant used force to pull the victim toward his car was sufficient to establish force above that required for misdemeanor false imprisonment. Thus, the conviction for felony false imprisonment is supported by sufficient evidence." (*Castro*, *supra*, 138 Cal.App.4th at p. 143; see also *People v. Ghipriel* (2016) 1 Cal.App.5th 828, 834 (*Ghipriel*) [agreeing with *Castro* that "[t]he additional force required for felony false imprisonment . . . may come in the form . . . of simply pulling a

17

victim toward a location when the victim's liberty has already been violated"].)

Hobbs makes unpersuasive attempts to distinguish *Castro* and *Ghipriel* on the grounds that "a great deal more had happened to the girl in *Castro*," and "the circumstances in *Ghipriel* are a light-year away from those" here, relying on the more overtly sexual acts at issue in those cases. But the reasoning of *Castro* did not depend on the sexual acts of the defendant, but rather on the fact that in pulling the victim toward his car, he used force "more than what was required to stop her and keep her where she was located." (*Castro, supra*, 138 Cal.App.4th at p. 143.) So too here. Substantial evidence supports the jury's conclusion that in lifting Madeleine from the ground and transporting her some 15 feet to the curb across the street, Hobbs used "physical force that [was] greater than the force reasonably necessary to restrain" her where she was. (CALCRIM No. 1240.)

### Substantial Evidence Supports the Jury's Finding that Hobbs' Touching of McCall M. and Kelsey S. Was Done For a Sexual Purpose

Hobbs argues that there was not substantial evidence to support the jury's finding of specific intent required for his two convictions of misdemeanor sexual battery (§ 243.4, subd. (e)(1)). Again, we disagree.

Section 243.4, subdivision (e)(1) provides that "[a]ny person who touches an intimate part of another person, if the touching is against the will of the person touched, and is for the specific purpose of sexual arousal, sexual gratification, or sexual abuse, . . . is guilty of misdemeanor sexual battery . . ." Accordingly, the jury was instructed, pursuant to CALCRIM No. 938, that these two counts required that: [¶] "1.) The defendant touched an intimate part of McCall M./Kelsey S.; [¶] 2.) The touching was done against

18

McCall M.'s/Kelsey S.'s will;  [¶]  AND  [¶]  3.) The touching was done for the specific purpose of sexual arousal, sexual gratification, or sexual abuse."  The instruction concluded:  "*Sexual abuse* means any touching of a person's intimate parts in order to cause pain, injury, or discomfort.  The perpetrator does not need to achieve any sexual arousal or sexual gratification."

Hobbs asserts that "the reasonable view of that which occurred with McCall M. and with Kelsey S. was simply that these events were yet other examples of Mr. Hobbs's maladjusted and seriously skewed perception of how one interacts with women in a civilized society," and that substantial evidence does not support a finding that "when he acted he had intended . . . 'to cause pain, injury, or discomfort' to either woman.' "

"Because intent can seldom be proved by direct evidence, it may be inferred from the circumstances.  [Citations.]  Circumstances which have been considered relevant to proving intent to satisfy sexual desires include: the charged act, extrajudicial statements, the relationship of the parties, other acts of lewd conduct, coercion or deceit used to obtain the victim's cooperation, attempts to avoid detection, offering of a reward for cooperation, a stealthy approach to the victim, admonishment of the victim not to disclose the occurrence, physical evidence of sexual arousal and clandestine meetings. [Citations.]"  (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 299; see *People v. Martinez* (1995) 11 Cal.4th 434, 445.)

To begin with, Hobbs completely ignores that in addition to sexual abuse, a touching constitutes sexual battery if done for the purpose of either sexual arousal or sexual gratification.  And there was ample substantial evidence from which the jury could conclude that Hobbs' touchings of McCall M. and Kelsey S. were done for one of these purposes.  Hobbs made a "stealthy approach" to both women—whom he did not know—coming up to

19

them quickly from behind and grabbing an intimate part of their bodies before they were aware of his presence. (*In re Jerry M.*, *supra*, 59 Cal.App.4th at p. 299.) Both women described the touchings as aggressive. McCall's testimony in particular at least suggested that the touching was so sexually aggressive that it was unprecedented for her, even by her husband or "someone . . . you would typically give permission to do that." The jury could infer that after touching McCall, Hobbs used deceit to obtain her cooperation and attempted to avoid detection by "pick[ing] up his pace" before turning back to tell her, " 'I thought you were someone else,' with a grin." After touching Kelsey S., Hobbs told her that he did so "[b]ecause [he] felt like it," speaking to her in a way that her friend Rachel testified was as though he made "some kind of lewd comment," "like he was talking about her body or something," and that it was "really off-putting and really creepy." And the jury considered all this against the backdrop that Hobbs was charged with two counts of sexual battery, as well as nine other counts stemming from unwanted touchings or interactions with women on the street, over the course of an 11-month period. All of the testimony provided ample substantial evidence in support of the jury's finding that Hobbs acted with a sexual purpose under section 243.4, subdivision (e)(1).

## DISPOSITION

The judgment is affirmed.

_____

RICHMAN, J.

We concur.

_____

STEWART,  P. J.

_____

DESAUTELS, J.

(A168137N)